**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JEROME LESLIE ALLEN,          *

Plaintiff                 *

v                     *         Civil Action No. ELH-15-3498

WESTERN CORRECTIONAL INSTITUTION,  *
*et al*.,
Defendants            *

                    ***

## <u>MEMORANDUM OPINION</u>

Jerome Leslie Allen, a self-represented Maryland prisoner, filed a civil rights suit against a host of defendants, alleging a variety of claims. ECF 1; ECF 7; ECF 8. In general, Allen alleges retaliation; deprivation of pain medication; deprivation of food; denial of adequate medical care; and conspiracy by correctional officers who "stood around and watched" while he was the victim of "hate crimes." ECF 1 at 3-4.

Defendants Wexford Health Sources, Inc. ("Wexford") and Robustiano Barrera, M.D. ("Medical Defendants") have filed a motion to dismiss. ECF 20 ("Medical Motion"). Defendants Western Correctional Institution ("WCI"); Lieutenant Curran P. McKenzie; Sergeant Thomas C. Menges; and Sergeant Jason A. Daddysman ("Correctional Defendants") have filed a motion to dismiss or, in the alternative, for summary judgment. ECF 29 ("Correctional Motion").[1] The summary judgment motion ("Correctional Motion") is supported by hundreds of pages of exhibits. *See* ECF 29-3 to ECF 29-17. Plaintiff opposes both motions. ECF 22; ECF 31. He has also submitted exhibits. The Medical Defendants replied. ECF 25.

---

[1] The Clerk shall amend the docket to reflect the correct names of the defendants. Plaintiff's Motion to Amend (ECF 26) is granted insofar as he seeks to correct the name of defendant Wexford.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, I shall construe the Correctional Motion (ECF 29) as a motion for summary judgment and grant it. I shall also grant Wexford's motion to dismiss (ECF 20). However, I shall deny the motion to dismiss (ECF 20) as to Dr. Barrera.

## I. Factual Background

Allen is a State inmate confined at the WCI in Cumberland, Maryland. He filed suit on November 17, 2015, initially naming only WCI and Wexford as defendants. ECF 1. Allen alleged that on October 26, 2015, he went to officers in his housing unit asking for assistance, claiming that he was being deprived of food because his medical "feed-in" papers were rescinded and that he did not receive pain medication because his bedrest papers were rescinded. *Id*. at 3. Plaintiff indicated that he advised Lt. McKenzie that he was suffering from back pain but McKenzie sent him back to his building. While plaintiff was returning to his unit, his legs gave out and he fell, hitting his head. Plaintiff got up to walk but fell and hit his head again. *Id*. According to Allen, he was denied medical attention by both custody and medical staff and was taken to lock-up. *Id*.

I directed plaintiff to file a supplemental complaint naming the individuals who he believed were responsible for the alleged mistreatment and the facts supporting his claim as to each named defendant. ECF 3. In response, Allen filed a letter indicating he was unable to comply with the court's directive while housed in the "Western Correctional Region." ECF 4. He asked for a transfer from WCI. *Id*. The letter, construed as a request for injunctive relief, was denied on February 26, 2016 (ECF 5), and plaintiff was given an additional 21 days to supplement his Complaint, as previously directed. *Id*.

Plaintiff filed correspondence in March 2016 (ECF 7), with an exhibit. The submission was construed as a supplemental complaint adding additional defendants.[2] ECF 9. In his supplemental filing, plaintiff asserted generalized allegations regarding interference with mail; racism; retaliation from unidentified correctional and medical staff; inadequate medical care; and "fear for [his] life." ECF 7 at 1.[3] Further, plainitff claims that he has suffered from harassment, and was called "black and dumb." *Id.* He states that he reported these comments to "Lt. Hendricks/Dtoglia?" and she took a report. In addition, plaintiff claims the medical department refuses to see him, despite his many health problems. *Id.* Plaintiff indicates that he filed suit because of malicious intent, gross negligence, and "hate crimes." *Id.*

Additionally, plaintiff alleges that he filed administrative remedy procedure (ARP) complaints but they were dismissed because he could not identify the officers involved, as they were not wearing name tags. ECF 7 at 1. Plaintiff claims that he contacted Lt. Menges, the ARP coordinator, about the problem with the lack of name tags but Menges took no corrective action, leaving him to believe that Menges is part of the "organization as well." *Id.* Because of these difficulties, plaintiff maintains that he could not use the ARP process. *Id.* Plaintiff adds that the Warden "is in on it." *Id.*

---

[2] Thereafter, plaintiff filed numerous letters with the court raising additional allegations not contained in his original complaint or his supplement. ECF 8; ECF 12; ECF 19; ECF 32. In particular, he included allegations regarding conditions of confinement; his July 8, 2016 disciplinary proceedings; false imprisonment/slavery; rights under the Universal Declaration of Human Rights; and state tort claims. These claims shall not be considered here.

[3] As support for plaintiff's claim that he is in fear for his life, plaintiff recounted that on February 7, 2016, he complained of chest pains and numbness on the left side of his body. ECF 7 at 1. He indicated that his "brain was on fire" and his nose was bleeding. He stated that he spoke to a nurse in front of Officers Frazer and Lohr, but the nurse told him to put in a sick call. Plaintiff stated that his symptoms continued and he turned in sick call slips but he was never seen by a health care provider. However, plaintiff states that he is not filing suit based on this incident. Rather, it is an example of why he fears for his safety. *Id.*

In his supplemental filing, plaintiff specified that on October 8, 2015, he was transferred from "MCI-H Hospital" to WCI in order to participate in the "wheelchair program" and undergo rehabilitation and physical therapy. ECF 7 at 1. He asserts that he was instructed by doctors to get out of his wheelchair whenever he could and to exercise, including playing basketball, and if he did not do so his condition would worsen. On October 16, 2015, he went to the small recreation yard where he got out of his wheelchair and played basketball by himself. He claims that cameras would show he struggled and once his body tightened up, he sat back in the wheelchair. He indicates that he was so weak that he had to obtain assistance from another inmate to return to his housing unit.

On October 20, 2015, at approximately 8:45 a.m., Allen was called to the medical unit and given "feed-in" status because of his arthritis. ECF 7 at 1. Plaintiff brought the papers to Housing Unit 3 and provided a copy to the 8-4 shift sergeant and returned to his cell. *Id.* A few minutes later the unidentified sergeant came to his cell and asked plaintiff for the rest of his papers. The sergeant then "balled" up the papers and said: "'If you want to eat go to chow hall.'" *Id.* Plaintiff explained his situation but the sergeant "began acting in an uncivilized manner." *Id.*

Later that day, plaintiff was told to return to the medical unit. At that time his wheelchair was confiscated by Sgt. Daddysman. *Id.* Plaintiff reports that Dr. Barrera said: "'I know, but they want me to take it.'" *Id.* Plaintiff returned to Housing Unit 3. He states that he tried to walk the long distance but his "body kept locking up . . . ." *Id.*

On October 23, 2015, his legs repeatedly gave out on him and he was taken to medical where he was given "feed-in" status until he could be evaluated by the doctor. He states the food came to his cell on the first day but from the 24th to 26th of October 2015, he had problems with the staff, who deprived him of his food trays. *Id.*

On October 26, 2015, Allen was advised that he was no longer on "feed-in" status. *Id.* at 2. Plaintiff went out on "the walk" to seek assistance from officers outside of his unit. When he made it to the chow hall and explained his situation, an officer took him to medical. *Id.* at 2. Lt. McKenzie came to medical and discussed plaintiff's situation with him. McKenzie directed plaintiff back to his housing unit because his "wife had been calling the institution." *Id.* Plaintiff asked McKenzie if he could get something for his pain because his body continued to "lock up" on him. McKenzie directed plaintiff to return to his building. On the way back to his housing unit, plaintiff passed officers, asked for help, but was ignored. *Id.*

As plaintiff was getting close to his housing unit, his legs gave out and he fell, hitting his head. ECF 7 at 2. Plaintiff got up and tried to walk but his legs gave out again, and again he struck his head. Allen indicates that he only remembers "bits and pieces" and when he woke up "they were pushing me to lock-up." *Id.* Plaintiff states he asked for medical attention repeatedly but his requests were ignored or denied. *Id.* According to Allen, during the events of October 26, 2015, unidentified officers laughed and cackled and otherwise made fun of him over the walkie-talkies. *Id.*

Later, the officer in Housing Unit 4 (the segregation unit) called Lt. McKenzie to find out why plaintiff was on lock-up. McKenzie stated that plaintiff had refused housing and was issued a ticket. *Id.* Plaintiff told the unidentified officer that he needed medical attention and that he was not refusing housing. The officer advised McKenzie that he was sending plaintiff back to his unit. Plaintiff states that "an hour later he received a ticket with a bunch of lies." *Id.*; *see also* ECF 22-2 at 3 (alleging McKenzie falsified the notice of inmate rule infraction).

According to plaintiff, a week passed before he was seen for the injuries to his face and head. The nurse told him that he had to be referred to the doctor. ECF 7 at 2; *see also* ECF 22-2

at 2. On November 5, 2015, Allen was taken to Bon Secours Hospital for an "electromyogram." It was determined that he had existing medical problems, including nerve impingement and spondylosis. ECF 7 at 2; *see also* ECF 22-2 at 2.

Plaintiff states that while he was housed at "JCI," he filed a complaint with officers and they mailed the complaints to the chief of security at WCI. ECF 7 at 2.[4] On November 8, 2015, a lieutenant interviewed plaintiff and said that he would be "in touch." *Id.* Plaintiff advised that he did not have any fear of other inmates but that he feared the officers and medical staff. He states that during this time he submitted sick call slips and ARPs but was threatened by officers about writing ARPs. *Id.* According to Allen, he continued to seek help from unnamed correctional officers but his requests were repeatedly denied or ignored. *Id.*

Plaintiff also claims that during this time he demanded to have an adjustment hearing. On November 5, 2015, an adjustment hearing was held and Allen was given 60 days of disciplinary segregation. Plaintiff claims that the officers, along with the Hearing Officer, David Sipes, produced "fraudulent paperwork." *Id.*

In addition, plaintiff alleges that unidentified correctional officers refused to provide him with a copy of his account printout, despite his requests. He states that this obstructs the legal process. Further, Allen asserts that his mail is taken. ECF 7 at 2.

In his opposition to the Medical Motion (ECF 22), plaintiff indicated for the first time that he is advancing his claim against the Medical Defendants based on an unidentified policy or custom of the Medical Defendants, which resulted in a violation of his rights.[5] *Id.* In support of

---

[4] I assume JCI refers to Jessup Correctional Institution and that plaintiff was temporarily housed there to facilitate his appointment at Bon Secours Hospital.

[5] Plaintiff also indicates that his incarceration limits him from access to legal materials to support his claim. ECF 22 at 1. Further, he states that he is requesting a default judgment against Wexford for failure to provide a responsive pleading. ECF 22-2.

his claim, Allen states that on July 16, 2015, he executed a release of information in favor of the Maryland Department of Public Safety and Correctional Services ("DPSCS"), which he gave to agents of Wexford so that they could verify his condition and adopt an appropriate course of treatment. According to plaintiff, on July 16, 2015, he was provided a crutch to use as a cane, because Wexford did not have a cane for someone of his height. In Allen's view, this demonstrates Wexford's knowledge that Allen suffers from a serious medical condition and it furnished an assistive device for him to ambulate. *Id*. at 4. Further, plaintiff indicates that an assessment dated October 8, 2015, indicated that he was transferred to WCI because his mobility was impaired and he was given a wheelchair as an adaptive device. *Id*. ECF 22-1 at 7.

In an attachment to his opposition (ECF 22-2), plaintiff states that he "honestly believe[s] that [Dr. Barrera] was afraid and in fear at the time of his wrongs" to Allen. *Id.* at 1. Further, he states: "Dr. Barrera should have taken up for me in front of those goons, but he didn't which is clear malpractice, negligence, etc." *Id.* Yet, he acknowledges that, under the circumstances, he "probably would have made the same choice." *Id.* Nevertheless, Allen adds: "It does not excuse his actions . . . but I do not want Dr. Barrera held accountable on the same level as the other Defendants. He could have said that he was 'sorry' and I would have forgave him." *Id.*

As to Wexford, Allen clarifies that he wishes to hold Wexford accountable. He reasons: "[A]s a corporation, it should ensure against interference from outside sources (i.e. correctional agents) and provide certain protocols for it's [sic] agents in distress." ECF 22-1 at 1-2.

Plaintiff has also submitted a copy of an ARP dated October 20, 2015, in which he detailed his complaint regarding the involvement of Daddysman and Barrera in the confiscation

---

Plaintiff misunderstands the date by which Wexford's response was due. The motion to dismiss is an appropriate response to the complaint. His request for a default judgment is without merit and is denied.

.

of his wheelchair. ECF 22-1 at 6. He recounted that he was called to the medical unit on October 20, 2015, and Dr. Barrera advised him that the correctional officers wanted the doctor to take plaintiff's wheelchair from him because he was observed playing basketball. *Id.* Plaintiff advised Barrera that other medical providers had instructed him to exercise, to play basketball, and do anything he could to strengthen and rehabilitate. He also reported that he was advised that the more he sat still the worse his condition would become. *Id.* According to plaintiff, Barrera acknowledged his agreement with this medical advice, but he explained that "the officers want him me to take [the] wheelchair . . . because they saw [Allen] on camera playing basketball." ECF 22-1 at 6.

In the ARP, plaintiff also stated that he and Barrera then began discussing Allen's "pain levels." *Id.* at 7. Sgt. Daddysman was in the room "the entire time" and "interrupted" the conversation, stating that he saw plaintiff playing basketball and he was taking the wheelchair. *Id.* Plaintiff objected, advising Daddysman not to take the wheelchair because he had not completed physical therapy and the rehabilitation program. *Id.* Plaintiff also stated that "medical overrides custody." *Id.* Further, Allen "pleaded" with Barrera and reported to Barrera that his legs were still weak. In addition, he alleged that he stood to show the doctor the weakness in his legs and Barrera responded, "'I know.'" *Id.* Nevertheless, in a "threatening and hostile manner," Daddysman took the wheelchair. *Id.* According to plaintiff, the incident was "cruel and humiliating." *Id.*

Daddysman then instructed plaintiff to leave the medical unit. Allen claimed that he was "scared and afraid," and he was "forced to walk back to [his] building in excruciating pain." ECF 22-1 at 7. Before Allen left, he told the doctor that the doctor needed to give him a walker

or a cane. Plaintiff stated that Barrera did not respond and "appeared afraid." *Id.*[6] Daddysman said: "'We don't have to give you shit, now man up and get out of here.'" *Id.*

Barrera advised plaintiff that he would renew his pain medication. *Id.* Daddysman became more hostile and plaintiff was in fear of being attacked, so he left and walked back to his housing unit "in terrible pain." *Id.* Once Allen was back at the housing unit, he asked for assistance from officers in the building but was told that he had to write medical and that the sergeant, with no medical training, took the wheelchair because he saw plaintiff playing basketball. ECF 22-1 at 7.

Plaintiff also reported in the ARP that he suffers from herniated discs, nerve damage and multi-level degenerative disc disease and was to continue receiving physical therapy and rehabilitation services. *Id.* at 7. He stated that because he had no wheelchair he missed several meals, due to the pain from the long walk to the chow hall and back. Further, he stated that he cannot receive a feed-in tray unless authorized by medical so he was forced to survive on bread, water, and coffee. *Id.* In his view, he has been "treated with absolute cruelty." *Id.*

In his attachment to his opposition (ECF 22-2), plaintiff also complains about the lack of adequate medical care. For example, he indicates that after the events of October 26, 2015, he had a swollen face and experienced considerable pain throughout his body. Yet, he complains that he was not seen by sick call until a week later, on November 1, 2015. *Id.* at 2. Further, he maintains that he was not seen by a registered nurse until November 24, 2015,[7] and that he was

---

[6] Plaintiff indicates in his "Motion to Amend/Supplement Plaintiff's Complaint" (ECF 26), filed December 22, 2016, that Barrera acted "out of fear, deprived [him] of an instrument that was ordered for [him] by a superior agent, to use as part of [his] rehabilitation." *Id.* at 1.

[7] In other documents attached to his opposition, Allen indicates that he was seen by a physician's assistant on November 16, 2015, while housed at JCI. ECF 22-2 at 4.

never seen by a doctor regarding his condition. *Id.* at 2. He adds: "I was made to suffer from lack of medical attention and pain . . . ." *Id.* In addition, Allen points to injuries he sustained on November 16, 2015. *Id.* And, he asserts that he was "<u>denied</u> medical treatment." *Id.*

Plaintiff also points out that he was taken to Bon Secours Hospital on November 5, 2015. According to Allen, this revealed that he suffered nerve impingement and spondylitis. *Id.* According to plaintiff, documents were removed from his medical file to conceal the findings of the electromyogram. *Id.*

Attached to his motion to amend (ECF 26), plaintiff has provided a copy of a medical report dated November 24, 2015. ECF 26-1. It indicates that Allen's wheelchair was returned to him on that date for use in traveling long distances. *Id.* at 2. He was also provided with a walker. *Id.*

**B.     Medical Defendants' response**

The Medical Defendants have moved only to dismiss the complaint for failure to state a claim, indicating that plaintiff's claim is not against them, but rather against the correctional officers he claims interfered with his receipt of medical care. ECF 20 at 2. Surprisingly, they also assert: "Plaintiff . . . set forth no allegations as to how Wexford or its employees, including Dr. Barrera, were deliberately indifferent . . . ." *Id.* The Medical Defendants have provided no medical records, declarations, or other exhibits to support their assertions.

**C.     Correctional Defendants' response**

**1.  Medical care**

The Correctional Defendants have submitted various exhibits, including extensive medical records of plaintiff. *See* ECF 29-4.[8]

---

[8] The medical records exceed 750 pages and were filed only in paper format.

In July 2015, plaintiff was housed at the Maryland Correctional Institution-Hagerstown (MCI-H). While there he was treated for chronic back pain which he said worsened after a fall on April 20, 2015. ECF 29-4 at 204. It was noted that plaintiff reported undergoing an MRI in March of 2014, before his incarceration, which showed herniation of multiple discs, nerve problems in the lumbar spine, and degenerative joint disease. *Id.*; *see also id.* at 243

On July 29, 2015, plaintiff reported numbness in his knees and legs and requested to be placed on "feed-in" status, *i.e.*, having meals delivered to him. ECF 29-4 at 210. He stated that he needed to be transferred to Jessup Correctional Institution ("JCI") so that his grandmother could visit him. *Id.* at 209-210. At that time, it was noted that plaintiff did not suffer any instability. He reported that he was working out on a regular basis and attending recreation and yard. *Id.* at 210. He advised medical staff that if he was being transferred to JCI he would return to his cell, but if he was being sent to WCI he would stay in the infirmary. *Id.* at 209-210. Plaintiff was directed to return to the compound pending any possible transfer. He left the dispensary "fully ambulating and using crutch to walk [without] any difficulty." *Id.*

The records reflect that on July 29, 2015, plaintiff reported that he was unable to walk stairs and requested feed-in orders. He reported to a captain, however, that he worked out regularly and he was seen "fully ambulating" and using a crutch to walk without difficulty. *Id.* at 210. Plaintiff requested morphine and oxycodone on August 10, 2015, reporting that his back hurt so much that he could not walk. However, he had walked to medical using his cane. Medical released Allen to his housing unit without any new orders for medication. *Id.* at 212.

Plaintiff was admitted to the MCI-H infirmary on August 15, 2015, after reporting that he fell and injured his back. ECF 29-4 at 215. Allen remained in the infirmary from August 15, 2015, until his transfer to WCI on October 8, 2015. *Id.* at 215-623.

Upon admission to the infirmary, Allen had no visible bruises, bleeding, redness, or deformities. ECF 29-4 at 215-17, 219. Allen's scheduled transfer to WCI was placed on medical hold. *Id*. at 78, 82. While Allen was housed in the infirmary, his food was delivered to him, he had access to the telephone and television, and he received frequent medical attention. *Id*. at 210, 371, 381, 388, 440, 457 448, 522, 540, 546, 583. On August 16, 2015, upon plaintiff's request, he was provided with a wheelchair. *Id*. at 221. The same day, it was recommended that plaintiff undergo a physical therapy evaluation and that he be educated on the use of a walker to prevent weakness and atrophy. *Id*. at 225, 229-30.

During Allen's time in the infirmary, he reported headaches, numbness in his legs, back pain, and tremors in his hand. It was noted that he exhibited abilities inconsistent with his statements about his condition. Notations were made by medical staff documenting their concern that plaintiff was malingering and his reports of falls were made to support his desire to achieve more comfortable living conditions.

Medical notes for September 7, 2015, reported that plaintiff exhibited no tremors "if he doesn't know you are watching him." *Id*. at 403. Plaintiff was observed on September 11, 2015, laying on his back, lifting both legs, flexing knees, and kicking his blankets. *Id*. at 432. On September 13, 2015, Allen reported pain in his back and left leg at a 9/10 pain level but continued watching football and talking during the examination. *Id*. at 457. On October 3, 2015, plaintiff reported head, back, and left leg pain at a 7/10 pain level. But, other inmates reported that he stood and walked when the nurses were not present. *Id*. at 588. And, the following notation was made in Allen's file on October 6, 2015: "Significant infirmary course....Inmate stands then will walk and fall. He has long history of this fall. Reason for wheelo [sic] chair. Neurology cannot find anything wrong with him they suggesting EMG of his lower ext." *Id*. at

609. Further, the record reflects: "MRI of head unremarkable." *Id.* However, an MRI showed degenerative disc changes at L4-L5 and L5-S1, and degenerative disc changes at "T12-L1," but "no stenosis." *Id.* At the "Lumbosacral junction" there was "left neural foramen disc bulging and disc annulus tear that causes mild stenosis but no apparent nerve impingement." *Id.*

In addition to notes regarding plaintiff's ability to walk and move his extremities, Allen's medical records reflect that MCI-H healthcare providers suspected his complaints were psychosomatic or malingering. *Id.* at 437 (9/11/15 recommendation for psychiatric testing to rule out malingering); *id.* at 482 (9/17/15 plaintiff indicated his understanding that condition may be psychosomatic), *id.* at 523 (9/24/15 plaintiff is described as "of uncertain credibility").

As noted, plaintiff was transferred from the infirmary to WCI on October 8, 2015. He was assessed by medical at WCI on that same day. ECF 29-4 at 36-37, 623-24. At that time his wheelchair use was continued. *Id.* Plaintiff's prior medical records were available to medical staff at WCI. *Id.* at 629.

Plaintiff was seen twice by medical staff on October 20, 2015. At 10:47 a.m., it was noted by Registered Nurse Dennis Martin that plaintiff requested feed-in status because he was in discomfort. *Id.* at 625. The feed-in status was limited until plaintiff could be seen by a provider, but later rescinded when security notified the nurse that plaintiff was seen on video playing basketball. *Id.* It was further noted that plaintiff was to see the provider for evaluation regarding whether he needed a wheelchair and feed-in status. *Id.*

At 3:48 p.m. a medical note was entered by Nurse Practitioner Kimberly Washbourne, stating, *id.* at 629:

> Patient is a recent transfer and review of medical notes from the other institution
> revealed that his SPINE MRI does not show significant impingement. A medical
> note from an MD provider noted that the neurologist who evaluated the patient
> can not see any reason why ne [sic] can not walk. Patient was videotaped playing

basketball. On exam the patient did not have any problem standing up and walking. With the help of the security the patients' wheelchair was taken.

Given the examination, review of Allen's medical records, and the report of his playing basketball, a medical order was entered to terminate Allen's use of a wheelchair. *Id*. at 629-31. Sgt. Daddysman avers in his Declaration that medical orders are made by medical professionals, not custody staff. He also avers that he had no input or influence with regard to the discontinuation of plaintiff's wheelchair. ECF 29-10 (Decl. of Daddysman), ¶ 10; *see also* ECF 29-3 at 47 (Statement of Daddysman on 11/17/15).

On October 26, 2015, the date on which plaintiff reports that he fell, no medical orders were in effect that plaintiff should not be walking, that he should have a cane, a wheelchair, other assistive device, or that he be fed in his cell. ECF 29-5 (Decl. of McKenzie), ¶ 2. An investigation of the fall was undertaken as a result of an ARP. ECF 29-3 at 46-46. It was determined by correctional staff that plaintiff faked the fall on October 26, 2015, in order to effectuate a transfer to another institution. ECF 29-3 at 46.[9]

Plaintiff submitted sick call slips on October 26 and 28, 2015 regarding the fall. ECF 29-4 at 72-74. As plaintiff asserts, he was not examined until November 1, 2015. At that time, he was examined by Registered Nurse Heather Ritchie. *Id*. at 632. No open areas or scratches were noted. *Id*. at 632.

Plaintiff reported that he fell and hit his head while attending a court proceeding on November 16, 2015. ECF 29-4 at 638. A small abrasion was observed on his left ankle. No neurological deficits were noted, but X-rays were ordered. *Id*. at 638-639.

On November 21, 2015, plaintiff was able to walk from his cell to the medical unit without assistance. He was observed getting in and out of a seated position with minimal signs of

_____

[9] ECF 29-3 consists of 110 pages.

discomfort. *Id*. at 641-642. At that time he complained of back and leg discomfort but he refused to take his pain medication. *Id*. On November 25, 2015, medical staff issued an order for a wheelchair for long distances, to expire November 26, 2016. *Id*. at 646-652. Plaintiff was also provided a walker and referred to physical therapy. *Id*.

Plaintiff's suit, dated November 9, 2015, was docketed on November 17, 2015. ECF 1. He alleged that he was injured in a fall on October 26, 2015. *Id.* In his initial complaint, plaintiff reported having received no medical attention. *Id*. In his supplemental complaint, filed on March 25, 2016, Allen indicated that he had not received proper medical care since his arrival at WCI and was "now...being denied completely." ECF 7 at 2. Plaintiff's medical records reveal, however, that he was seen by medical staff at WCI on at least 27 occasions from November 1, 2015 to March 15, 2016. *Id*. at 632-685.

WCI Warden Graham and Former Assistant Warden Gelsinger aver that medical staff handle the scheduling of all care in response to sick call slips and that correctional staff have no discretion or control of that process. ECF 29-8 (Decl. of Gelsinger), ¶¶ 2, 3; ECF 29-9 (Decl. of Graham), ¶¶ 2, 3. Further, they aver that they have not, nor have any employees of WCI/DPSCS, interfered with, hindered, or delayed medical treatment or care to plaintiff. ECF 29-8, ¶ 5; ECF 29-9, ¶ 5.

### 2. Disciplinary Proceeding

Plaintiff was issued a Notice of Inmate Rule Violation ("NOI") on October 26, 2015. ECF 29-3 at 23-25. He was placed on disciplinary segregation for the use of threatening language toward staff. ECF 29-3 (Decl. of Tennille Winters, Case Management Specialist), ¶ 2; *id.* at 23-37. Lt. McKenzie issued the Notice of Infraction, ECF 29-3 at 23, stating that at 12:15 p.m. he saw Allen

stop in front of chow hall #1. Allen stopped and talked with Sgt. S Beeman, who ordered Allen to go eat his afternoon meal. Allen walked away and as he approached chow hall # 3 slowly went to his knees. Allen was then escorted to the Medical area by Sgt. C. Benson....I then entered the Medical area and questioned Allen. Allen informed me that his back was hurting and that he wasn't leaving until he saw a doctor. I informed Allen that if he did not have a pass that he was to submit a sick call slip to see the doctor. Allen the stated "Fuck you and that pass, you people can't do this shit to me. I'm going to get my people on you." I then ordered Allen to return to his unit. Allen stood up and left the area. At approximately 1250 hours Allen was observed falling out on the compound. Allen was then placed in a wheelchair and escorted to H.U. #4. . . .

*See also* ECF 29-5 (Decl. of Lt. Curran McKenzie), ¶ 2; ECF 29-6 (Decl. of Sgt. Carl Benson), ¶ 2; ECF 29-7 (Decl. of Sgt. Steven Beeman), ¶ 2.

Allen was charged with violations of Rule 104 (use of intimidating, coercive, or threatening language); Rule 312 (interference with or resisting the performance of staff duties; and Rule 401 (refusing to work, carry out an assignment, or accept a housing assignment). ECF 29-3 at 23-24. However, he refused to attend the disciplinary hearing. *Id*. at 28. Hearing Officer David Sipes found, based on the evidence presented, that plaintiff was not guilty of violating rules 312 and 401 but was guilty of violating rule 104, *i.e.*, using "intimidating, coercive or threatening language" by saying he was going to "get [his] people on you." *Id*. at 31-33. As a result, plaintiff was sanctioned with 60 days of segregation and loss of good conduct credits. *Id*. at 32. He was provided a copy of the hearing officer's findings. *Id*. at 35.

Sipes avers that in reaching his decision he did not rely on any fraudulent paperwork. ECF 29-11 (Decl. of Sipes), ¶ 5. Nor did he conspire or have knowledge of any conspiracy regarding the matter. *Id.*

### 3. Administrative Remedy Process

The Correctional Defendants indicate that from October 7, 2015 through December 7, 2016, plaintiff submitted 26 administrative remedy complaints ("ARPs"). ECF 29-3 at 38-40.

From October 20, 2015, through the filing of his supplemental complaint on March 25, 2016, Allen filed 9 ARPs. *Id*. at 38.

In ARP #1809-15, filed on October 20, 2015, Allen complained that Sgt. Daddysman took Allen's wheelchair. *Id*. at 41-53. The ARP was dismissed on November 16, 2015, because it was determined that medical staff rescinded plaintiff's wheelchair orders, not Daddysman. Moreover, there appeared to be a basis for the rescission, as Allen walked without issue from the chow hall to medical and then from medical to housing unit 3. *Id*. at 44.

On October 27, 2015, plaintiff submitted 4 ARPs, all asserting that his feed-in status was violated. *Id*. at 38, 87-90. Each ARP was returned to Allen with instructions to resubmit with evidence of a feed-in order issued by medical staff as well as the identification of the officers involved. *Id*. Plaintiff did not resubmit any of the ARPs. *Id*.

Plaintiff submitted ARP #1846-15 on October 28, 2015, complaining about his interaction with Lt. Curran McKenzie on October 26, 2015, and the alleged fall. *Id*. at 54-55. He admitted that he walked on the compound to seek assistance form officers outside his building, alleging he was harassed and deprived of food. As relief, he requested, among other things, a transfer to JCI. *Id*. at 54-55. By November 12, 2015, Allen was directed to resubmit the complaint with evidence of a medical ordered feed-in status and specifics regarding the alleged harassment. *Id.* at 54. But, Allen never submitted the requested information. Therefore, the ARP was dismissed. *Id*.

In ARP #2009-15, dated November 23, 2015, Allen alleged he was denied medical care for 4 hours after he fell off a stool. *Id*. at 38. The complaint was returned with a request to resubmit with a statement of injuries. *Id*. Plaintiff did not resubmit the ARP. *Id*.

Plaintiff filed ARP #2027-15 on November 24, 2015, complaining that his transfer recommendation of November 5, 2015, was not being acted upon. *Id*. at 56. He also alleged that he had been denied access to a doctor since October 26, 2015. *Id*. Plaintiff was directed to resubmit the ARP, identifying the person who told him he was being transferred. He failed to do so. *Id*. at 38, 56.

As of the filing of Correctional Defendants' dispositive motion, plaintiff had not appealed any ARP dismissal. ECF 29-14 (Decl. of Kristina Donnelly, Executive Assistant), ¶ 2. Nor did he properly pursue his remedies before the Inmate Grievance Office ("IGO"). ECF 29-15 (Decl. of Russell Neverdon, Sr., Executive Director of the IGO).

On April 27, 2016, after the filing of the instant suit, plaintiff filed an ARP complaining about handling of his ARPs by Thomas Menges. ECF 29-3 at 38, 83-85. The ARP was dismissed. Plaintiff was advised that if he did not believe his ARPs were properly dismissed he must follow the inmate appeal procedure. *Id*. at 83. Sgt. Menges avers (ECF 29-16) that he did not attempt to hinder plaintiff's access to the ARP process. *Id.* ¶ 3. Further, he avers that he did not threaten or conspire with other officers to threaten Allen for filing ARPs. *Id*.

### 4. Access to courts

Plaintiff has written to the court on at least 12 occasions between November 17, 2015 to date. ECF 1; ECF 2; ECF 4; ECF 6; ECF7; ECF 8; ECF 12; ECF 19; ECF 22; ECF 26; ECF 31; and ECF 32. His submissions include exhibits and arguments that cite statutes, constitutional provisions, and cases. *See*, *e.g*., ECF 22; ECF 26; ECF 31. Additionally, employees of WCI submitted plaintiff's account information to this court. ECF 10. Further, Rodney Davis, plaintiff's case manager, avers that while he has no specific recollection as to whether he requested an account printout for court purposes, had plaintiff asked him for a printout of his

account for court purposes it would have been provided to him. ECF 29-13, ¶ 2. Warden Richard Graham, Jr. and former Assistant Warden Denise Gelsinger aver that neither they nor any employee of WCI interfered with, obstructed, or hindered plaintiff's access to communication with the court or to legal materials. ECF 29-9 (Decl. of Graham), ¶ 6; ECF 29-8 (Decl. of Gelsinger), ¶ 6.

## II. Standards of Review

### 1. Motion for Summary Judgment

The Correctional Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 29. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed Appx. 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

No Scheduling Order has been issued in this case setting forth deadlines for discovery. *See* Local Rule 803.1 (D. Md. 2016). Absent a Scheduling Order, the parties generally are not entitled to engage in discovery. And, summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).  Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal

citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Attached to plaintiff's response to the Medical Defendants' motion is a request for production of documents (ECF 22-1). Plaintiff seeks his complete medical records from Wexford, all medical records from his time of incarceration in the DPSCS, medical records of MRIs and any other medical procedures conducted at Diagnostic Imaging Services, and all rules, regulations and policies of Wexford regarding treatment of prisoners with chronic back injury and pain. ECF 22-1 at 1. Plaintiff's medical records were submitted as an exhibit to the Correctional Motion. ECF 29-2. As such, plaintiff's request for access to his medical records is moot. Plaintiff has failed to explain his need for Wexford's rules, regulations, and policies. He does not offer any explanation for why such information is necessary for his opposition.

Additionally, plaintiff indicates in his submissions that he has been unable to obtain declarations and affidavits from witnesses because he has been held on disciplinary segregation and because witnesses have been transferred from the institution. ECF 22 at 1; ECF 31 at 1. However, plaintiff has not identified the witnesses, nor has he specified what they would say (other than indicating witnesses exist in regard to his general complaint of denial of access to the courts and mail tampering, ECF 31 at 1), or how such testimony is necessary for his opposition to the pending motions.

Plaintiff also indicates that his primary health care physician and pain management specialist have unspecified evidence "that supports that there is a genuine controversy and that [he] was denied adequate medical attention." ECF 31 at 2. Although Allen claims that he is unable to obtain this information, he does not explain why. He also indicates that, due to his

incarceration, he is unable to obtain unspecified evidence that he mailed to his relatives. *Id*. at 1. He does not explain how his incarceration prevents him from accessing this information.

Further, plaintiff claims there is camera footage as well as telephone conversations from October 26, 2015, which "will clearly prove that some, if not all of the Defendants are providing false testimony under the penalties of perjury." *Id*. at 2. He does not describe the substance of the camera footage or telephone conversations, nor does he explain how this information contradicts defendants' declarations.

Plaintiff has not filed an affidavit in compliance with Rule 56(d) as to his requests for discovery. Additionally, plaintiff has been provided with copies of his medical records, disciplinary proceedings, and administrative remedy requests. Plaintiff has provided no indication as to how the additional information he requests is necessary in order to respond to the pending motions. Nor is there any indication that any additional materials would create a genuine issue of material fact. As such, I am satisfied that it is appropriate to address the Correctional Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving

party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). As indicated, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia*

*Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

## 2. Motion to Dismiss

As noted, the Medical Defendants have filed only a motion to dismiss. They do not seek summary judgment in the alternative. This court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See*

*Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC,* 672 Fed. App'x at 222 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'" (Citation omitted) (bracket in *Adams Housing, LLC*).

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the complaint. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, ___ U.S. ____, 133 S. Ct. 1709 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to ensure that defendants are provided with "fair notice" of the claim(s) made against them and the "grounds" for entitlement to relief. *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

"When determining whether a complaint fails to comply with Rule 8(a), 'courts have looked to various factors, including the length and complexity of the complaint, *whether the complaint was clear enough to enable the defendant to know how to defend himself*, and whether the plaintiff was represented by counsel.'" *Rush v. Am. Home Mortg.*, Inc., WMN-07-854, 2009 WL 4728971, at *4 (D. Md. Dec. 3, 2009) (emphasis added) (quoting *North Carolina v. McGuirt*, 114 Fed. App'x. 555, 558 (4th Cir. 2004) (per curiam)) (internal citations omitted). A court may properly dismiss a complaint under Rule 12(b)(6) for failure to comport with Rule 8(a) if the complaint "does not permit the defendants to figure out what legally sufficient claim the plaintiffs are making and against whom they are making it." *McGuirt*, 114 Fed. App'x at 559.

Thus, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken

as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co.*, *supra*, 637 F.3d at 440 (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012).

In general, courts do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243. But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also Meridian Investments, Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 577 (4th Cir. 2017) ("A defendant's claim that an action is time-barred is an affirmative defense that it can raise in a

motion to dismiss when the "face of the complaint includes all necessary facts for the defense to prevail.") (citation omitted). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

Under limited exceptions, a court may consider documents beyond the complaint without converting a motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). A court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ." *Goines*, 822 F.3d at 166 (citations omitted); *see U.S. ex rel. Oberg*, 745 F.3d at 136 (quoting *Philips v. Pitt Cty Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

### III. Discussion

### A.      Western Correctional Institution

Plaintiff's civil rights case is founded on Title 42 U.S.C.§ 1983. It provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . ." 42 U.S.C. §1983 (emphasis supplied).

Conduct amenable to suit under 42 U.S.C. §1983 must be conduct taken by a person. Western Correctional Institution is not a person amenable to suit under §1983. Therefore, WCI's motion to dismiss shall be granted.

### B. Failure to Exhaust

The Correctional Defendants raise the affirmative defense of non-exhaustion and assert that the suit must be dismissed pursuant to the Prisoner Litigation Reform Act, 42 U.S.C. §1997e. The Prisoner Litigation Reform Act provides, in pertinent part, 42 U.S.C. § 1997e:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd,* 98 Fed. Appx. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). A claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, ____ U.S. ____, 136 S. Ct. 1850, 1857 (2016). And, a court ordinarily may not excuse a failure to exhaust. *Id.* at 1856 (citing *Miller v. French* 530 U.S. 327, 337 (2000) ("The mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion").

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit,

reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008) (recognizing that exhaustion provides prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (stating that prisoner must follow all administrative steps to satisfy the exhaustion requirement, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette,* 517 F.3d at 725, 729; *see Langford v. Couch,* 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory."). But, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

However, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross*, *supra*, 136 S. Ct. 1850, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id.* at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855.

The Fourth Circuit addressed the meaning of "available" remedies in *Moore v. Bennette,* 517 F. 3d at 725, stating:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

And, more recently, the *Ross* Court stated that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30.

However, the *Ross* Court also identified three kinds of circumstances in which an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically

speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

The DPSCS has made an "administrative remedy procedure" available to Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining ARP); OPS.185.0002.02.[10] The grievance procedure applies to the submission of "grievance[s] against…official[s] or employee[s] of the Division of Correction ['DOC']" C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC]…against any officials or employees of the [DOC]…arising from the circumstances of

---

[10] OPS.185.0002 is an Executive Directive created by the DPSCS, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive"). The ARP Directive was submitted as a defense exhibit in the case of *Payton v. Bishop*, ELH-15-3648, ECF 16-2. Effective August 14, 2015, the ARP Directive established the "policy and procedures for an Administrative Remedy Procedure (ARP) . . . to provide a method for resolving an inmate complaint related to specific conditions of confinement." *Id.*

"[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see* Fed. R. Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, __ U.S. __, 132 S. Ct. 115 (2011); *Philips*, 572 F.3d at 180. In particular, pursuant to Fed. R. Evid. 201, a court may take judicial notice of an adjudicative fact if it is "not subject to reasonable dispute," in that it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990), the Court recognized that a district court may "properly take judicial notice of its own records."

custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; DCD 185-002 (effective August 27, 2008).

To pursue a grievance, a prisoner confined in a DOC facility may file with the IGO a grievance against any DOC official or employee. C.S. § 10-206(b). However, if the DOC institution has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b); *see also* OPS.185.0002.02.10.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official." OPS.185.0002.05C(1). C.S. § 1-101(k) defines a managing official "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." In the DOC, each facility's warden is responsible for the administrative remedy procedure at the institutional level. DCD # 185-003VI. Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A.

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP. In that circumstance, the prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee. OPS.185.0002.05C(2). For prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent. DCD # 185-004VI.

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR

12.07.01.05B; *see also* DCD 185-002, § VI(N)(1). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B.

An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07D; *see also* Md. Code, Title 10 of the State Government Article.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A. But, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)(2), (c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. But, an inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See*, *e.g.*, *Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

The ARP process applies to many kinds of inmate complaints that "relate to or involve a prisoner's 'conditions of confinement.'" *Massey v. Galley*, 392 Md. 634, 651, 898 A.2d 951, 960 (2006) (citation omitted). However, the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Id.* at 646, 898 A.2d at 958 (citation omitted). Nor does the ARP process apply to case management decisions, which are to be directly grieved to the IGO. OPS.185.0002.05F(1). And, it does not apply to Maryland Parole Commission procedures, decisions to withhold mail, or Prison Rape Elimination Act related claims. OPS.185.0002.05F(2), (4), (5). Those categories of complaints are addressed through separate administrative processes. *Id.*[11]

With respect to disciplinary procedures, if a prisoner is found guilty of a rule violation, the prisoner is entitled to appeal the hearing officer's decision or sanction to the warden of the facility where he or she is incarcerated. COMAR 12.02.27.33(A)(1),(2). If the prisoner does not file a written appeal with the warden within fifteen days of receipt of the hearing officer's decision, he or she is considered to have waived the right to appeal. *Id.*, COMAR 12.02.27.33(A)(3). If the warden affirms the hearing officer's guilty finding or sanction, the prisoner may then appeal to the IGO. COMAR 12.02.27.33(D); *see also* COMAR 12.07.01.05

---

[11] Also, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000). Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

and .06C. When filing this appeal with the IGO, the prisoner is required to include a copy of the initial notice of inmate rule violation, the hearing record, the appeal to the warden, and the warden's response to the appeal. COMAR 12.07.01.04(B)(9)(b).

A prisoner may pursue the ARP process to allege that correctional officers used excessive force. But, such an ARP may be procedurally dismissed if the Internal Investigations Division decides to conduct an investigation into the use of force incident at issue in the ARP. OPS.185.0002.05.E(6) & K(3)(e). If this procedural dismissal indicates that no further action may be taken through the ARP process, a prisoner may then file a grievance directly with the IGO, as there would be no further administrative remedies available through the ARP process. C.S. § 10-206(b).

In his opposition, plaintiff states erroneously that the Supreme Court has held that exhaustion of remedies is not required to bring a civil rights case. ECF 31 at 5. Additionally, he baldly claims that "the administrative remedy procedure is so grossly defective as to be non-existent" and that agents operated in capacities which they were not authorized to discharge their duties obstructing his use of the ARP process. *Id*. Plaintiff "concedes that [he] did not file an ARP for retaliation." *Id*. He states that he did not do so because agents denied him ARPs and because he was fearful for his life, health, and well being after the incidents of July 8, 2016. *Id*. at 6. He also claims that he is entitled to the privileges and rights as detailed in the International Covenant on Civil and Political Rights, which he claims does not require him to exhaust administrative remedies. *Id*.

Although plaintiff initiated the ARP process as to several of his complaints, he failed to file an appeal of the dismissal as to any of them, or to pursue his remedies before the IGO. ECF 29-14; ECF 29-15. Each time plaintiff was directed to resubmit an ARP with additional

information, rather than attempting to cure his deficiencies, or explain why he could not comply with the directive, plaintiff simply abandoned the process.

Plaintiff's belated effort to file ARPs regarding Menges's handling of his grievances is also unavailing. An ARP filed after institution of the suit does not exhaust the remedies as to those claims. *Wright v. Hollingsworth*, 260 F. 3d 357, 358 (5th Cir. 2001); *Jernigan v. Stuchell*, 304 F. 3d 1030, 1032 (10th Cir. 2002).

The record evidence is clear that plaintiff had ample access to the ARP process. Allen's bald allegation that the ARP process is defective is unavailing as he provides no specific information in support of this claim. He does not explain why he failed to resubmit any of the ARPs as directed, nor does he explain his failure to take his grievance to the appellate or IGO levels. In light of the foregoing, plaintiff's claims against the Correctional Defendants are subject to dismissal for failure to exhaust administrative remedies.

Even if plaintiff had properly exhausted his claims, the Correctional Defendants would still be entitled to summary judgment, for the reasons that follow. And, Wexford is entitled to dismissal of the suit.

### B.    Medical Claim

As to plaintiff's claims regarding interference with medical care, the Eighth Amendment of the United States Constitution governs the analysis. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted

to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), resonates here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with

knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official"s "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

However, even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Moreover, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

### 1.      Correctional Defendants

The Fourth Circuit has identified two slightly different aspects of a correctional official's state of mind that must be shown in order to satisfy the subjective component in the context of medical care. First, actual knowledge of the risk of harm to the inmate is required. *Young v. Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officer  should have recognized it."). Beyond such knowledge, however, the officer must also have "recognized that his actions were

insufficient" to mitigate the risk of harm to the inmate arising from his medical needs. *Parrish*, 372 F.3d at 303 (emphasis added); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Here, there is no evidence that any of the Correctional Defendants were aware that failure to provide plaintiff a wheelchair or feed-in status, after he was observed playing basketball, and after his medical provider rescinded the orders, posed a risk of harm to him. The Correctional Defendants had no direct personal involvement in plaintiff's medical care or the provision of medical equipment. Even if plainitff advised the escorting officers that he had difficulty walking, the uncontradicted evidence demonstrates that he was seen walking without difficulty about the compound, and that medical personnel rescinded the medical orders requiring or recommending that he be provided assistive devices or feed-in status. As such, there is no indication that the Correctional Defendants were either aware of a known risk of harm to plaintiff or recognized that their actions were insufficient to mitigate any risk of harm.

The record evidence is simply devoid of information to support plaintiff's claim that the Correctional Defendants were in any way deliberately indifferent to his health needs. Therefore, Correctional Defendants are entitled to summary judgment.

### 2.    Medical Defendants

The Medical Defendants moved to dismiss the complaint under Fed. R. Civ. Proc. 12(b)(6). ECF 20. They erroneously assert that plaintiff claims only that prison custody officials have prevented him from receiving medical care. The court cannot read plaintiff's claim so narrowly.

A fair reading of plaintiff's complaint, as supplemented, indicates that he alleges that Dr. Barrera knew plaintiff required the use of a wheelchair but stood by while custody staff directed its confiscation. Plaintiff also complains that he was denied access to a medically prescribed

ambulatory aid, which resulted in further injury. ECF 7. In addition, Allen recounts various injuries he allegedly sustained that went without treatment or for which the treatment was inadequate. Moreover, plaintiff alleges a history of spinal problems and claims that at WCI he was sometimes deprived of the wheelchair that he contends was medically necessary.

The pleadings of a self-represented litigant are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). And, "pleadings should not be scrutinized with such technical nicety that a meritorious claim should be defeated, and even if the claim is insufficient in substance, it may be amended to achieve justice." *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978) (citing *Rice v. Olson*, 324 U.S. 786, 791-92 (1945); *Holiday v. Johnston*, 313 U.S. 342, 350 (1941)). Therefore, Dr. Barrera's motion to dismiss shall be denied.[12]

Wexford's motion to dismiss shall, however, be granted. Other than naming Wexford in the caption of the complaint, plaintiff set forth no allegations against Wexford until he filed his opposition, baldly claiming that his constitutional rights were violated due to an unspecified policy, custom, or practice of Wexford, and citing *Monell v. New York City Dept. of Soc. Serv's*., 426 U.S. 658, 690 (1978). ECF 22. Plaintiff failed, however, to identify any policy or procedure attributable to Wexford that caused any of his alleged injuries. As such, his claim as to Wexford fails.

## C. Disciplinary Proceedings

Plaintiff alleges that Sipes and other correctional staff conspired to file and prosecute the disciplinary charges against him. His claim fails.

Prisoners retain rights under the Due Process Clause, but prison disciplinary proceedings

---

[12] Dr. Barrera's counsel failed to address the merits of plaintiff's claim by providing affidavits or exhibits for the court to review. Nor did counsel for Dr. Barrera join in the Correctional Defendants' dispositive motion.

are not part of a criminal prosecution and the full array of rights due a defendant in such proceedings does not apply. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)). In prison disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections. These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See Wolff*, 418 U.S. at 564-66, 592.

There is no constitutional right to confront and cross-examine witnesses or to retained or appointed counsel. *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004). As long as the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied. *See Baxter*, 425 U.S. at 322, n.5. Moreover, substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985).

Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact. *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980). The findings will only be disturbed when unsupported by any evidence, or when wholly arbitrary and capricious. *See Hill*, 472 U.S. at 456; *see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990). As long as there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy. Here, plaintiff received notice of the rule violation, an opportunity

to be heard, which he declined, and a written decision based upon some evidence.

In sum, plaintiff received all the process that was due. A conclusory allegation of a conspiracy such as is made in this case is insufficient to state a claim. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2nd Cir. 1997) (unsupported claim of conspiracy to issue false disciplinary reports fails to state claim); *Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988) ("Allegations of conspiracy . . . must be pled with sufficient specificity and factual support to suggest a meeting of the minds.") (quotation omitted). *Langworthy v. Dean*, 37 F. Supp.2d 417, 424-25 (D. Md.); *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (complaint alleging conspiracy to retaliate in conclusory terms deficient).

### D. ARP process

To the extent plaintiff alleges there were problems with the processing of his ARPs, his claim fails. As discussed, the PLRA generally requires exhaustion of administrative remedies before a federal action concerning prison conditions may be filed by a prisoner. The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Further clarification regarding exhaustion as a pleading requirement was announced by the United States Court of Appeals for the Fourth Circuit in *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674 (4th Cir. 2005), in which the Court said that "an inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant." *Id*. at 681.

To the extent that a prisoner's attempts to exhaust the administrative remedy process are thwarted by prison officials' misconduct, that evidence may be presented in response to the affirmative defense. *Id*. at 682. Thus, an inability to access the administrative remedy procedure based on an alleged refusal by prison officials to enforce the rules governing the process does not run afoul of the due process clause. Assuming, *arguendo*, that Menges did not satisfactorily investigate or respond to plaintiff's ARP requests, plaintiff's claim nonetheless fails, as he has not alleged any injury as a result of any failure to investigate his ARPs. Rather than correctional staff interfering with his ARPs, it was plaintiff who failed to participate in the process. His ARPs were returned to him for supplementation, but he declined to follow the directives provided to him and thus his claims were dismissed.

**E.     Access to the Courts**

Plaintiff alleges that the court required a copy of his inmate account printout but correctional staff would not give it to him. Further, he contends that he could prove someone is stealing money and that unnamed correctional staff were obstructing his legal process by taking his mail and ignoring his request for the account printout ECF 7 at 2.

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977). But, in *Lewis v. Casey*, 518 U. S. 343, 355 (1996), the Court said:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show "actual injury" to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349.

Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 399. Conclusory allegations are not sufficient in this regard. *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006) (denying access to court claim based on allegation that petition for a writ of certiorari had, for unspecified reasons, been dismissed and where plaintiff did not even mention the point on appeal).

The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). "[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show the 'arguable' nature of the underlying claim is more than hope." *Id*. at 416 (footnote omitted). A prisoner's right to access the courts does not include the right to present frivolous claims. *Lewis v. Casey*, 518 U.S. at 353 n.3.

As noted, the court received plaintiff's account statement. ECF 10. He has failed to allege any actual harm arising from the conduct complained of. As such, his claims of interference with his mail/access to courts is subject to dismissal.

## F.    Harassment and Retaliation

Plaintiff's claims of verbal harassment and retaliation are also unavailing.  Verbal abuse of inmates by guards, without more, states no claim of assault.  *Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979); *see also Carter v. Morris*, 164 F.3d 215, 219, n 3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim).  The insults alleged in this case are not condoned by this court, but fall short of acts forbidden by the constitution.  *See Pink v. Lester*, 52 F.3d 73, 75 (1995) ("[N]ot all undesirable behavior by state actors is unconstitutional.").  Moreover, plaintiff's claim fails to identify who made the alleged statements.

In order to prevail on a claim of retaliation, plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right."  *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   In *ACLU of Md., Inc. v. Wicomico Cty, Md.*, 999 F.2d 780, 785 (4th Cir. 1993), the Court said:

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972).  Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment.  *See Burton v. Livingston*, 791 F.2d 97, 100-01 (8th Cir. 1986) (stating that "complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim).  Nevertheless, "[a] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone."  *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

In the prison context, such claims are treated "with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d at 74). Plaintiff "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996). Plaintiff has failed to meet this threshold pleading requirement. Rather, he raises claims of retaliation in wholly conclusory terms.

## IV. Conclusion

For the foregoing reasons, the Medical Motion shall be DENIED as to Dr. Barrera and GRANTED as to Wexford. The Correctional Motion, construed as a motion for summary judgment, shall be GRANTED as to all Correctional Defendants and judgment will be ENTERED in favor of the Correctional Defendants and against plaintiff.

A separate Order follows.


August 21, 2017                                    _____/s/_____
Date                                               Ellen L. Hollander
                                                   United States District Judge