IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME LESLIE ALLEN,                    *

Plaintiff                               *

v                                       *          Civil Action No. ELH-15-3498

ROBUSTIANO BARRERA, M.D.,               *
*et al*.,
Defendants                              *
                                       ***

## MEMORANDUM OPINION

Jerome Leslie Allen, a self-represented Maryland prisoner, filed a civil rights suit against a host of defendants, alleging a variety of claims. ECF 1; ECF 7; ECF 8. In general, Allen alleged retaliation; deprivation of pain medication; deprivation of food; denial of adequate medical care; and conspiracy by correctional officers who "stood around and watched" while he was the victim of "hate crimes." ECF 1 at 3-4.

In a Memorandum Opinion (ECF 33) and Order (ECF 34) of August 21, 2017, I granted the motion for summary judgment filed by defendants Western Correctional Institution ("WCI"); Lt. Curran McKenzie; Sergeant Thomas Menges; and Sergeant Jason Daddysman. I also granted the motion to dismiss filed by Wexford Health Sources, Inc. *Id.* However, I denied the motion to dismiss filed by Robustiano Barrera, M.D. *Id.*; *see* ECF 20.[1] I noted that the Medical

---

[1] Defendant David Sipes was not served (ECF 15), nor did he join the prior summary judgment motion. *See* ECF 29. Plaintiff alleged that Sipes, the hearing officer at his rule infraction hearing, participated in a conspiracy to falsify records.

Although Sipes did not participate in the earlier summary judgment motion, Sipes filed a Declaration (ECF 29-11), explaining that he found plaintiff guilty of using intimidating language and not guilty of the other charges. ECF 29-11, ¶ 4. He denied producing any fraudulent or false documents. Further, he denied acting in a retaliatory or conspiratorial manner with staff in respect to plaintiff's case, and further denied being aware of any false or fraudulent records being prepared by staff in regard to plaintiff's claim. *Id.* ¶ 5.
(continued)

Defendants filed no medical records to support their assertions. ECF 33 at 10. In contrast, the Correctional Defendants submitted extensive medical records. *Id.*

Now pending is a motion for summary judgment filed by defendant Robustiano Barrera, M.D. ECF 35. In support of his Motion, Dr. Barrera has submitted various exhibits, including his own Affidavit and over 350 pages of plaintiff's medical records. ECF 35-2 (Medical Records); ECF 35-3 (Barrera Affidavit). Plaintiff opposes the Motion. ECF 37;[2] ECF 38. He has also submitted exhibits. ECF 39.

Due to an unexplained error, Barrera's memorandum of law was not electronically submitted when the summary judgment motion was filed. It has since been docketed. *See* ECF 41. The motion and the memorandum shall be referred to collectively as the "Motion." Plaintiff was advised of the filing error and was granted an additional twenty-one days to supplement his opposition to the Motion. ECF 42. His supplemental opposition is docketed at ECF 43.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, I shall grant the Motion.

## I. Factual Background

Barrera, a licensed physician, served as the acting Medical Director of NBCI and WCI from December 2015 to May 2017. ECF 35-3, ¶ 2. He resigned from his employment with Wexford Health Sources, Inc., effective August 4, 2017. *Id.*

---

Because Sipes was not served, the Memorandum Opinion and Order did not dispose of plaintiff's Complaint as to Sipes. In my view, if Sipes had joined the summary judgment motion, he would have been entitled to summary judgment, for the reasons stated in the Memorandum Opinion of August 21, 2017. ECF 33 at 45-47. Because Sipes was never served, however, I shall dismiss the claims against him, without prejudice.

[2] Plaintiff's allegation that he is allergic to Tylenol, raised for the first time in his opposition, is not properly before the court and will not be considered.

Plaintiff complains that Dr. Barrera "allowed" correctional staff "to forcefully remove" his wheelchair. ECF 37 at 2. Further, he contends that he is "a forced SLAVE whose many rights have been violated and deprived . . . ." *Id.* at 4. He argues that has been deprived of adequate medical care. *Id.*

In ECF 33, I previously recounted the factual background of this case. The pertinent summary concerning the alleged denial of medical care follows, *id.* at 2-6:

> Allen is a State inmate confined at the WCI in Cumberland, Maryland. He filed suit on November 17, 2015, initially naming only WCI and Wexford as defendants. ECF 1. Allen alleged that on October 26, 2015, he went to officers in his housing unit asking for assistance, claiming that he was being deprived of food because his medical "feed-in" papers were rescinded and that he did not receive pain medication because his bedrest papers were rescinded. *Id.* at 3. Plaintiff indicated that he advised Lt. McKenzie that he was suffering from back pain but McKenzie sent him back to his building. While plaintiff was returning to his unit, his legs gave out and he fell, hitting his head. Plaintiff got up to walk but fell and hit his head again. *Id.* According to Allen, he was denied medical attention by both custody and medical staff and was taken to lock-up. *Id.*
>
> *      *      *
>
> Plaintiff filed correspondence in March 2016 (ECF 7), with an exhibit. The submission was construed as a supplemental complaint adding additional defendants.[] ECF 9. In his supplemental filing, plaintiff asserted generalized allegations regarding interference with mail; racism; retaliation from unidentified correctional and medical staff; inadequate medical care; and "fear for [his] life." ECF 7 at 1.[] Further, plaintiff claims that he has suffered from harassment, and was called "black and dumb." *Id.* He states that he reported these comments to "Lt. Hendricks/Dtoglia?" and she took a report. In addition, plaintiff claims the medical department refuses to see him, despite his many health problems. *Id.* Plaintiff indicates that he filed suit because of malicious intent, gross negligence, and "hate crimes." *Id.*
>
> *      *      *
>
> In his supplemental filing, plaintiff specified that on October 8, 2015, he was transferred from "MCI-H Hospital" to WCI in order to participate in the "wheelchair program" and undergo rehabilitation and physical therapy. ECF 7 at 1. He asserts that he was instructed by doctors to get out of his wheelchair whenever he could and to exercise, including playing basketball, and if he did not do so his condition would worsen. On October 16, 2015, he went to the small recreation yard where he got out of his wheelchair and played basketball by

himself. He claims that cameras would show he struggled and once his body tightened up, he sat back in the wheelchair. He indicates that he was so weak that he had to obtain assistance from another inmate to return to his housing unit.

On October 20, 2015, at approximately 8:45 a.m., Allen was called to the medical unit and given "feed-in" status because of his arthritis. ECF 7 at 1. Plaintiff brought the papers to Housing Unit 3 and provided a copy to the 8-4 shift sergeant and returned to his cell. *Id.* A few minutes later the unidentified sergeant came to his cell and asked plaintiff for the rest of his papers. The sergeant then "balled" up the papers and said: "'If you want to eat go to chow hall.'" *Id.* Plaintiff explained his situation but the sergeant "began acting in an uncivilized manner." *Id*.

Later that day, plaintiff was told to return to the medical unit. At that time his wheelchair was confiscated by Sgt. Daddysman. *Id*. Plaintiff reports that Dr. Barrera said: "'I know, but they want me to take it.'" *Id.* Plaintiff returned to Housing Unit 3. He states that he tried to walk the long distance but his "body kept locking up . . . ." *Id.*

On October 23, 2015, [plaintiff's] legs repeatedly gave out on him and he was taken to medical where he was given "feed-in" status until he could be evaluated by the doctor. He states the food came to his cell on the first day but from the 24th to 26th of October 2015, he had problems with the staff, who deprived him of his food trays. *Id.*

According to plaintiff, on a number of instances he collapsed due to not having the use of a wheelchair. *Id*. at 5. Ultimately, on November 5, 2015, he was taken to Bon Secours Hospital for an "electromyogram," which revealed that he had existing medical problems, including nerve impingement and spondylosis. *Id.* at 6 (citing ECF 7 at 2; *see also* ECF 22-2 at 2.)

Additionally, I previously said, ECF 33 at 7-10:

In support of his claim, Allen states that on July 16, 2015, he executed a release of information in favor of the Maryland Department of Public Safety and Correctional Services ("DPSCS"), which he gave to agents of Wexford so that they could verify his condition and adopt an appropriate course of treatment. According to plaintiff, on July 16, 2015, he was provided a crutch to use as a cane, because Wexford did not have a cane for someone of his height. In Allen's view, this demonstrates Wexford's knowledge that Allen suffers from a serious medical condition and it furnished an assistive device for him to ambulate. *Id*. at 4. Further, plaintiff indicates that an assessment dated October 8, 2015, indicated that he was transferred to WCI because his mobility was impaired and he was given a wheelchair as an adaptive device. *Id*. ECF 22-1 at 7.

In an attachment to his opposition (ECF 22-2), plaintiff states that he "honestly believe[s] that [Dr. Barrera] was afraid and in fear at the time of his wrongs" to Allen. *Id.* at 1. Further, he states: "Dr. Barrera should have taken up for me in front of those goons, but he didn't which is clear malpractice, negligence, etc." *Id.* Yet, he acknowledges that, under the circumstances, he "probably would have made the same choice." *Id.* Nevertheless, Allen adds: "It does not excuse his actions . . . but I do not want Dr. Barrera held accountable on the same level as the other Defendants. He could have said that he was 'sorry' and I would have forgave him." *Id.*

\*        \*        \*

Plaintiff has also submitted a copy of an ARP dated October 20, 2015, in which he detailed his complaint regarding the involvement of Daddysman and Barrera in the confiscation of his wheelchair. ECF 22-1 at 6. He recounted that he was called to the medical unit on October 20, 2015, and Dr. Barrera advised him that the correctional officers wanted the doctor to take plaintiff's wheelchair from him because he was observed playing basketball. *Id.* Plaintiff advised Barrera that other medical providers had instructed him to exercise, to play basketball, and do anything he could to strengthen and rehabilitate. He also reported that he was advised that the more he sat still the worse his condition would become. *Id.* According to plaintiff, Barrera acknowledged his agreement with this medical advice, but he explained that "the officers want him me to take [the] wheelchair . . . because they saw [Allen] on camera playing basketball." ECF 22-1 at 6.

In the ARP, plaintiff also stated that he and Barrera then began discussing Allen's "pain levels." *Id.* at 7. Sgt. Daddysman was in the room "the entire time" and "interrupted" the conversation, stating that he saw plaintiff playing basketball and he was taking the wheelchair. *Id.* Plaintiff objected, advising Daddysman not to take the wheelchair because he had not completed physical therapy and the rehabilitation program. *Id.* Plaintiff also stated that "medical overrides custody." *Id.* Further, Allen "pleaded" with Barrera and reported to Barrera that his legs were still weak. In addition, he alleged that he stood to show the doctor the weakness in his legs and Barrera responded, "'I know.'" *Id.* Nevertheless, in a "threatening and hostile manner," Daddysman took the wheelchair. *Id.* According to plaintiff, the incident was "cruel and humiliating." *Id.*

Daddysman then instructed plaintiff to leave the medical unit. Allen claimed that he was "scared and afraid," and he was "forced to walk back to [his] building in excruciating pain." ECF 22-1 at 7. Before Allen left, he told the doctor that the doctor needed to give him a walker or a cane. Plaintiff stated that Barrera

did not respond and "appeared afraid." *Id.*[6] Daddysman said: "'We don't have to give you shit, now man up and get out of here.'" *Id.*

---

FN6 in ECF 33 Plaintiff indicates in his "Motion to Amend/Supplement Plaintiff's Complaint" (ECF 26) that Barrera acted "out of fear, deprived [him] of an instrument that was ordered for [him] by a superior agent, to use as part of [his] rehabilitation." *Id*. at 1.

---

Barrera advised plaintiff that he would renew his pain medication. *Id.* Daddysman became more hostile and plaintiff was in fear of being attacked, so he left and walked back to his housing unit "in terrible pain." *Id*. Once Allen was back at the housing unit, he asked for assistance from officers in the building but was told that he had to write medical and that the sergeant, with no medical training, took the wheelchair because he saw plaintiff playing basketball. ECF 22-1 at 7.

Plaintiff also reported in the ARP that he suffers from herniated discs, nerve damage and multi-level degenerative disc disease and was to continue receiving physical therapy and rehabilitation services. *Id.* at 7. He stated that because he had no wheelchair he missed several meals, due to the pain from the long walk to the chow hall and back. Further, he stated that he cannot receive a feed-in tray unless authorized by medical so he was forced to survive on bread, water, and coffee. *Id*. In his view, he has been "treated with absolute cruelty." *Id.*

In his attachment to his opposition (ECF 22-2), plaintiff also complains about the lack of adequate medical care. For example, he indicates that after the events of October 26, 2015, he had a swollen face and experienced considerable pain throughout his body. Yet, he complains that he was not seen by sick call until a week later, on November 1, 2015. *Id.* at 2. Further, he maintains that he was not seen by a registered nurse until November 24, 2015,[7] and that he was never seen by a doctor regarding his condition. *Id*. at 2. He adds: "I was made to suffer from lack of medical attention and pain . . . ." *Id.* In addition, Allen points to injuries he sustained on November 16, 2015. *Id.* And, he asserts that he was "<u>denied</u> medical treatment." *Id.*

---

FN7 in ECF 33 In other documents attached to his opposition, Allen indicates that he was seen by a physician's assistant on November 16, 2015, while housed at JCI. ECF 22-2 at 4.

---

Plaintiff also points out that he was taken to Bon Secours Hospital on November 5, 2015. According to Allen, this revealed that he suffered nerve impingement and spondylitis. *Id*. According to plaintiff, documents were removed from his medical file to conceal the findings of the electromyogram. *Id*.

Attached to his motion to amend (ECF 26), plaintiff has provided a copy of a medical report dated November 24, 2015. ECF 26-1. It indicates that Allen's wheelchair was returned to him on that date for use in traveling long distances. *Id.* at 2. He was also provided with a walker. *Id.*

In summarizing the 750 pages of medical records provided by the correctional defendants, I recounted plaintiff's medical history and course of treatment stating, ECF 33 at 11-14:

In July 2015, plaintiff was housed at the Maryland Correctional Institution-Hagerstown (MCI-H). While there he was treated for chronic back pain which he said worsened after a fall on April 20, 2015. ECF 29-4 at 204. It was noted that plaintiff reported undergoing an MRI in March of 2014, before his incarceration, which showed herniation of multiple discs, nerve problems in the lumbar spine, and degenerative joint disease. *Id.*; *see also id.* at 243.

On July 29, 2015, plaintiff reported numbness in his knees and legs and requested to be placed on "feed-in" status, *i.e.*, having meals delivered to him. ECF 29-4 at 210. He stated that he needed to be transferred to Jessup Correctional Institution ("JCI") so that his grandmother could visit him. *Id.* at 209-210. At that time, it was noted that plaintiff did not suffer any instability. He reported that he was working out on a regular basis and attending recreation and yard. *Id.* at 210. He advised medical staff that if he was being transferred to JCI he would return to his cell, but if he was being sent to WCI he would stay in the infirmary. *Id.* at 209-210. Plaintiff was directed to return to the compound pending any possible transfer. He left the dispensary "fully ambulating and using crutch to walk [without] any difficulty." *Id.*

The records reflect that on July 29, 2015, plaintiff reported that he was unable to walk stairs and requested feed-in orders. He reported to a captain, however, that he worked out regularly and he was seen "fully ambulating" and using a crutch to walk without difficulty. *Id.* at 210. Plaintiff requested morphine and oxycodone on August 10, 2015, reporting that his back hurt so much that he could not walk. However, he had walked to medical using his cane. Medical released Allen to his housing unit without any new orders for medication. *Id.* at 212.

Plaintiff was admitted to the MCI-H infirmary on August 15, 2015, after reporting that he fell and injured his back. ECF 29-4 at 215. Allen remained in the infirmary from August 15, 2015 until his transfer to WCI on October 8, 2015. *Id.* at 215-623.

Upon admission to the infirmary, Allen had no visible bruises, bleeding, redness, or deformities. ECF 29-4 at 215-17, 219. Allen's scheduled transfer to

WCI was placed on medical hold. *Id*. at 78, 82. While Allen was housed in the infirmary, his food was delivered to him, he had access to the telephone and television, and he received frequent medical attention. *Id*. at 210, 371, 381, 388, 440, 457 448, 522, 540, 546, 583. On August 16, 2015, upon plaintiff's request, he was provided with a wheelchair. *Id*. at 221. The same day, it was recommended that plaintiff undergo a physical therapy evaluation and that he be educated on the use of a walker to prevent weakness and atrophy. *Id*. at 225, 229-30.

During Allen's time in the infirmary, he reported headaches, numbness in his legs, back pain, and tremors in his hand. It was noted that he exhibited abilities inconsistent with his statements about his condition. Notations were made by medical staff documenting their concern that plaintiff was malingering and his reports of falls were made to support his desire to achieve more comfortable living conditions.

Medical notes for September 7, 2015, reported that plaintiff exhibited no tremors "if he doesn't know you are watching him." *Id*. at 403. Plaintiff was observed on September 11, 2015, laying on his back, lifting both legs, flexing knees, and kicking his blankets. *Id*. at 432. On September 13, 2015, Allen reported pain in his back and left leg at a 9/10 pain level but continued watching football and talking during the examination. *Id*. at 457. On October 3, 2015, plaintiff reported head, back, and left leg pain at a 7/10 pain level. But, other inmates reported that he stood and walked when the nurses were not present. *Id*. at 588. And, the following notation was made in Allen's file on October 6, 2015: "Significant infirmary course.... Inmate stands then will walk and fall. He has long history of this fall. Reason for wheelo [sic] chair. Neurology cannot find anything wrong with him they suggesting EMG of his lower ext." *Id*. at 609. Further, the record reflects: "MRI of head unremarkable." *Id.* However, an MRI showed degenerative disc changes at L4-L5 and L5-S1, and degenerative disc changes at "T12-L1," but "no stenosis." *Id.* At the "Lumbosacral junction" there was "left neural foramen disc bulging and disc annulus tear that causes mild stenosis but no apparent nerve impingement." *Id.*

In addition to notes regarding plaintiff's ability to walk and move his extremities, Allen's medical records reflect that MCI-H healthcare providers suspected his complaints were psychosomatic or malingering. *Id*. at 437 (9/11/15 recommendation for psychiatric testing to rule out malingering); *id.* at 482 (9/17/15 plaintiff indicated his understanding that condition may be psychosomatic), *id.* at 523 (9/24/15 plaintiff is described as "of uncertain credibility").

As noted, plaintiff was transferred from the infirmary to WCI on October 8, 2015. He was assessed by medical at WCI on that same day. ECF 29-4 at 36-37, 623-24. At that time his wheelchair use was continued. *Id*. Plaintiff's prior medical records were available to medical staff at WCI. *Id*. at 629.

Plaintiff was seen twice by medical staff on October 20, 2015. At 10:47 a.m., it was noted by Registered Nurse Dennis Martin that plaintiff requested feed-in status because he was in discomfort. *Id*. at 625. The feed-in status was limited until plaintiff could be seen by a provider, but later rescinded when security notified the nurse that plaintiff was seen on video playing basketball. *Id*. It was further noted that plaintiff was to see the provider for evaluation regarding whether he needed a wheelchair and feed-in status. *Id*.

At 3:48 p.m. a medical note was entered by Nurse Practitioner Kimberly Washbourne, stating, *id.*at 629:

> Patient is a recent transfer and review of medical notes from the other institution revealed that his SPINE MRI does not show significant impingement. A medical note from an MD provider noted that the neurologist who evaluated the patient can not see any reason why ne [sic] can not walk. Patient was videotaped playing basketball. On exam the patient did not have any problem standing up and walking. With the help of the security the patient's wheelchair was taken.

Given the examination, review of Allen's medical records, and the report of his playing basketball, a medical order was entered to terminate Allen's use of a wheelchair. *Id*. at 629-31. . . .

\*　　　\*　　　\*

On October 26, 2015, the date on which plaintiff reports that he fell, no medical orders were in effect that plaintiff should not be walking, that he should have a cane, a wheelchair, other assistive device, or that he be fed in his cell. ECF 29-5 (Decl. of McKenzie), ¶ 2. An investigation of the fall was undertaken as a result of an ARP. ECF 29-3 at 46-46. It was determined by correctional staff that plaintiff faked the fall on October 26, 2015, in order to effectuate a transfer to another institution. ECF 29-3 at 46.

Plaintiff submitted sick call slips on October 26 and 28, 2015 regarding the fall. ECF 29-4 at 72-74. As plaintiff asserts, he was not examined until November 1, 2015. At that time, he was examined by Registered Nurse Heather Ritchie. *Id*. at 632. No open areas or scratches were noted. *Id*. at 632.

Plaintiff reported that he fell and hit his head while attending a court proceeding on November 16, 2015. ECF 29-4 at 638. A small abrasion was observed on his left ankle. No neurological deficits were noted, but X-rays were ordered. *Id*. at 638-639.

On November 21, 2015, plaintiff was able to walk from his cell to the medical unit without assistance. He was observed getting in and out of a seated

position with minimal signs of discomfort. *Id*. at 641-642. At that time he complained of back and leg discomfort but he refused to take his pain medication. *Id*. On November 25, 2015, medical staff issued an order for a wheelchair for long distances, to expire November 26, 2016. *Id*. at 646-652. Plaintiff was also provided a walker and referred to physical therapy. *Id*.

Plaintiff's suit, dated November 9, 2015, was docketed on November 17, 2015. ECF 1. He alleged that he was injured in a fall on October 26, 2015. *Id*. In his initial complaint, plaintiff reported having received no medical attention. *Id*. In his supplemental complaint, filed on March 25, 2016, Allen indicated that he had not received proper medical care since his arrival at WCI and was "now...being denied completely." ECF 7 at 2. Plaintiff's medical records reveal, however, that he was seen by medical staff at WCI on at least 27 occasions from November 1, 2015 to March 15, 2016. *Id*. at 632-685.

With this background, I turn to the Motion. As noted, Dr. Barrera has submitted over 350 pages of plaintiff's medical records (ECF 35-2), along with his own Affidavit. ECF 35-3.

Barrera asserts that plaintiff was admitted to the infirmary at the Maryland Correctional Institution on August 15, 2015. ECF 35-3, ¶ 5. Based on plaintiff's complaints of tremors, falling, and difficulty standing, he underwent an MRI of his brain, spine, and left knee. *Id*. The studies were "unremarkable," except for the lumbar spine study, which showed "mild stenosis and mild disc bulge at the L5S1 w/disc degeneration." *Id*.

On October 1, 2015, plaintiff was seen by a neurology specialist who found, based on his examination of plaintiff as well as the imaging studies that had been conducted, that there was "no cause for plaintiff's symptom[s]." ECF 35-3, ¶ 6. Nevertheless, the neurologist recommended additional testing via an electromyogram. *Id*.

During the time plaintiff was in the infirmary, he had physical therapy but did not participate in any strenuous activities or contact sports like basketball. *Id*. ¶ 7. Plaintiff used a wheelchair for ambulation throughout his infirmary admission. *Id*. ¶ 8.

On October 8, 2015, plaintiff was discharged from the infirmary to general population at WCI, with an order in place for use of a wheelchair. *Id*. No instructions were issued on

discharge recommending plaintiff engage in "strenuous physical activity," such as contact sports. *Id.*

Barrera avers that he has no recollection of participating in the decision by NP Kimberly Washbourne on October 20, 2016, to rescind the wheelchair order for plaintiff. *Id.* at ¶ 11. He denies that he was ever "directed, threatened or bullied by correctional staff into discontinuing medical assignments for inmates." *Id.* He explains that any decision made by him either to issue or revoke a medical assignment was a "professional clinical judgment" that took into consideration "the inmate's medical history, current physical medical condition, and relevant information" presented by DPSCS staff and other health care providers, "including information reflecting that an inmate had engaged in physical activity inconsistent" with his "complaints . . . ." ECF 35-3, ¶ 12.

Although Barrera has no recollection of consulting with Washbourne regarding the rescission of Allen's wheelchair order (*id.* ¶ 11), he indicates that the decision was appropriate clinically, given the information available at that time. *Id.* ¶ 13. MRI imaging, as well as evaluations by on site and off site physicians and specialists, did not provide any clinical support for plaintiff's claim of severe pain and lower extremity weakness. *Id.* Additionally, no written instructions were issued encouraging plaintiff to perform strenuous activities, including participating in "contact sports." *Id.* Barrera adds: "Plaintiff playing basketball together with the absence of clinical evidence to support Plaintiff's symptom complaints suggested malingering or fabricating of symptoms for secondary gain." *Id.*

On November 5, 2015, plaintiff was again evaluated by neurologist Harjit Bajaj, M.D., for administration of nerve conduction studies ("NCS") and an EMG, because of his complaint of severe headache. ECF 35-3, ¶ 15; ECF 35-2 at 128-129. Bajaj noted that the MRI of plaintiff's

head was normal. The MRI of plaintiff's lumbar spine showed multi-level lumbar disc disease without cord compression or large disc herniation. ECF 35-3, ¶ 15. The NCS and EMG showed no myopathy or neuropathy. *Id*. However, "the studies suggested there might be multi-level chronic degenerative disc changes or chronic lumbar spondylosis with some radiculopathy signs at the L5-S1 level." *Id*. Bajaj recommended that plaintiff receive physical therapy with a rehabilitation program, back extension exercises, ultrasound treatment of the back, and enrollment in a pain management program. *Id*. Bajaj did not recommend a wheelchair or other ambulatory aide. ECF 35-3, ¶ 15. No injuries were documented that could have been attributed to plaintiff's recently reported falls. *Id*.

Plaintiff submitted a sick call slip on December 2, 2015, complaining of pain and indicating that his pain medication was to be increased. He also indicated he needed paperwork for a walker, cane, and a long distance wheelchair. He was given a steroid injection later that day. ECF 35-3,¶ 19; ECF 35-2 at 150. Plaintiff submitted another sick call slip on December 14, 2015, complaining of "crushing pain" in his lower back. ECF 35-3, ¶ 20; ECF 35-2 at 156. He was seen on December 17, 2015, by physical therapist Stephen Ryan. He assessed Allen as suffering from lumbar spondylitis and gait dysfunction. A physical therapy plan was developed. ECF 35-3, ¶ 20; ECF 35-2 at 157. Plaintiff attended ten physical therapy sessions and reevaluations between December 21, 2015 and March 23, 2016. ECF 35-3, ¶ 20.

On December 24, 2015, plaintiff received paperwork for a bottom bunk and bottom tier housing for one year. ECF 35-3, ¶ 21; ECF 35-2 at 163.

On January 6 and January 18, 2016, plaintiff was seen by medical staff concerning his walker. ECF 35-3, ¶¶ 22 & 23; ECF 35-2 at 167, 176. It was noted that because plaintiff had been housed on segregation, he had not received a walker and would receive a walker as soon as

one was available. ECF 35-3, ¶ 22; ECF 35-2 at 167.  Plaintiff was referred for an additional physical therapy consultation. ECF 35-3, ¶ 23; ECF 35-2 at 178. On February 18, 2016 and March 23, 2016, plaintiff signed for a walker. ECF 35-3, ¶ 24; ECF 35-2 at 190, 202.

Barrera evaluated plaintiff on April 29, 2016, when plaintiff came into the medical department in a wheelchair, carrying his walker. ECF 35-3, ¶ 25; ECF 35-2 at 213.  Plaintiff requested a single cell and a wheelchair pusher to prevent his hands from getting dirty while he propelled himself. *Id*. Plaintiff indicated that legally all of his demands should be met but Barrera advised plaintiff that only the requests that were medically necessary could be met.  ECF 35-3, ¶ 25.  *Id*. Examination revealed normal musculature with no skeletal tenderness or joint deformity.  It was also noted that muscle tone in both thighs and gastrocnemius muscles were normal, without signs of atrophy anticipated from inactivity. Barrera reviewed and renewed plaintiff's medications and provided him with paperwork that permitted him to use gloves when wheeling himself in the wheelchair. *Id*.

Plaintiff was seen by Dr. Barrera on May 17, 2016, for a pain medication evaluation. ECF 35-3, ¶ 26.  Other health care providers saw plaintiff on June 14, 2016, June 18, 2018, June 21, 2016, July 21, 2016, and September 9, 2016. ECF 35-3, ¶¶ 22-31; ECF 35-2 at 224, 230, 235-246, 253, 262.  Over the course of those visits, plaintiff's pain medications were adjusted, he received an intramuscular injection of Toradol, was referred for additional diagnostic testing, which was unremarkable, and received a back brace.  ECF 35-3, ¶¶ 26-30.  He reported doing better and his chronic pain management plan was continued.  ECF 35-3, ¶¶ 30-31; ECF 35-2 at 262.

Plaintiff was evaluated on November 14, 2016, and November 15, 2016, due to complaints of back pain with pain radiating down his legs. ECF 35-3, ¶ 32; ECF 35-2 at 289.  It

was noted that x-rays of plaintiff's spine from June 2016 were unremarkable. ECF 35-3, ¶ 32. Nonetheless, Allen's medication was increased, and he was directed to avoid heavy lifting. ECF 35-3, ¶ 32.

Mahoob Ashraf, M.D. examined plaintiff on November 29, 2016. ECF 35-3, ¶ 33. NP McLaughlin saw plaintiff on December 7, 2016. ECF 35-3, ¶ 34. *See also* ECF 35-2 at 294-300, 305-309.

On February 23, 2017, plaintiff reported that his "back condition was stable" but exacerbated by sitting on his bunk all day. ECF 35-3, ¶ 37. He was issued paperwork allowing him to have an extra chair in his cell to address his complaint about sitting on his bunk. He returned his walker and received a cane. *Id.* His medications were also continued. *Id.* Allen had a chronic care visit on May 25, 2017. *Id.* ¶ 36. He "raised no complaints related to his back." *Id.*

Barrera avers that as a chronic care patient, plaintiff will continue to have regular access to medical providers. He may also use the sick call system for issues arising between scheduled appointments. ECF 35-3, ¶ 37.

## II. Standard of Review

Barrera has moved for summary judgment. Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for

discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)

(quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file

an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for

specified reasons, it cannot present facts essential to justify its opposition," without needed

discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit

requirement of former Rule 56(f)). "[T]o justify a denial of summary judgment on the grounds

that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be

'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D.

Md. 2011) (alteration in original) (citation omitted). Moreover, a nonmoving party's Rule 56(d)

request for additional discovery is properly denied "where the additional evidence sought for

discovery would not have by itself created a genuine issue of material fact sufficient to defeat

summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll*., 55 F.3d 943, 954 (4th Cir. 1995);

*see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274

(4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of

summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure

to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for

discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted); *see Dave & Buster's,

Inc. v. White Flint Mall, LLLP*, 616 F. App'x, 552, 561 (4th Cir. 2015). But, the nonmoving

party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment

ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on

the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and

the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Plaintiff has not sought discovery in response to Barrera's dispositive motion. And, he has been provided with voluminous medical records. As such, I am satisfied that it is appropriate to address the motion for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs*., 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### III. Discussion

Plaintiff's claims regarding the denial of adequate medical care are governed by the Eighth Amendment to the United States Constitution, which prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of ... inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986);

*see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

Notably, "[n]ot all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.' " *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley*, 475 U.S. at 319–21). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Thompson*, 878 F.3d at 97.

To sustain a claim for denial of adequate medical care under the Eighth Amendment, plaintiff must show that defendants' acts or omissions amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. at 106; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and, subjectively, that the prison staff was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. 837. Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40. As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (Citation omitted). Although this "'entails more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).

In order "[t]o show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").

As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Thus, "[a]ctual knowledge or

awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 755 F.3d at 178. In *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), the Court said: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences ... To lower this threshold would thrust federal courts into the daily practices of local police departments." Therefore, mere negligence or malpractice does not rise to a constitutional level. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble, supra*, 429 U.S. at 106).

For plaintiff to prevail, the treatment rendered "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A

plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). And, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105.

Even if the requisite subjective knowledge is established, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)). Moreover, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Here, the evidence, viewed in the light most favorable to plaintiff, establishes that he received constitutionally adequate medical care for his various medical conditions. Indeed, plaintiff attended regular medical appointments with trained health care providers who provided ongoing attention to his medical complaints, his pain management, physical therapy, and assistive devices related to his ailments.

Plaintiff was a recent transfer to WCI when he was observed playing basketball in the yard. The neurologist could not find an objective basis to explain plaintiff's falls. Upon direct

examination of plaintiff, he appeared to stand and walk largely without difficulty. It was not unreasonable for the wheelchair and feed-in orders to be rescinded.

Of import here, the records indicate that Washbourne, not Barrera, was responsible for the rescission on October 20, 2015, of the medical order regarding Allen's right to use a wheelchair. Plaintiff insists, however, that Washbourne had no authority to do so, and that it was really Barrera who rescinded the wheelchair order. ECF 37 at 2. The record does not support that claim.

However, even if it was Barrera who rescinded the wheelchair order, as plaintiff claims, the medical record demonstrates that such a decision, in light of the information available at the time, was reasonable. When the wheelchair order was rescinded on October 20, 2015, the information before the medical providers, including direct physical examination of plaintiff, reasonably supported the decision. And, about a month later, the order was revisited and plaintiff was provided with a wheelchair to assist him with ambulating long distances.

Allen contends that the reissuance of the wheelchair on November 24, 2015, "proves that the initial removal" constituted inadequate medical care. ECF 37 at 3. This is hardly so. The recission of the wheelchair was temporary; it lasted about a month. Plaintiff's complaint amounts to little more than disagreement with the course of treatment provided. In any event, revisiting the decision reflects considered medical judgment, not disregard for plaintiff's medical needs.

When viewing the evidence as a whole, and in the light most favorable to plaintiff, no evidence exists that rescinding the wheelchair order, or other brief delays in treatment, amounted to deliberate indifference. *See Estelle*, 429 U.S. at 105-06 (holding that an inadvertent failure to provide adequate medical care does not amount to deliberate indifference). As noted,

"[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)).

## IV. Conclusion

The record demonstrates sound reasons for the course of medical treatment provided to plaintiff, which are unrebutted by plaintiff. Therefore, Barrera's motion for summary judgment will be GRANTED and judgment will be ENTERED in favor of Barrera and against plaintiff.

Plaintiff's complaint against Sipes shall be dismissed.

A separate Order follows.


August 22, 2018                                          /s/
Date                                          Ellen L. Hollander
                                          United States District Judge